IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2016


**JEROME S. BARRETT v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1791    Steve R. Dozier, Judge**

---

**No. M2015-01161-CCA-R3-PC – Filed August 18, 2016**

---

The Petitioner, Jerome S. Barrett, appeals as of right from the Davidson County Criminal Court's denial of his petition for post-conviction relief wherein he challenged his conviction for second degree murder. On appeal, he asserts that trial counsel was ineffective in the following ways: (1) for failing to call an alibi witness; (2) for failing to call a deoxyribonucleic acid ("DNA") expert; and (3) for failing to timely request independent DNA testing. Following our review, we affirm the judgment of the post-conviction court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**


D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

David Harris (on appeal); and Jason Chaffin (at hearing), Nashville, Tennessee, for the appellant, Jerome S. Barrett.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and Tom Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

FACTUAL BACKGROUND

In 2009, the Petitioner was convicted of second degree murder for the February 1975 murder of nine-year-old Marcia Trimble. The Petitioner's conviction was affirmed by a panel of this court on direct appeal, and our supreme court declined further review. See State v. Jerome Sidney Barrett, No. M2009-02636-CCA-R3-CD, 2012 WL 2870571

(Tenn. Crim. App. July 13, 2012), perm. app. denied (Tenn. Dec. 12, 2012). On direct appeal, this court provided a comprehensive review of the evidence presented at trial. See id. at *1-25. Briefly, on the evening of February 25, 1975, the victim left her Nashville home to deliver Girl Scout cookies to a neighbor who lived across the street. When the victim's mother called for her approximately twenty-five minutes later, the victim did not respond and did not return home. Id. at *1.

Following an extensive search, the victim's body was found on March 30, 1975, in a neighbor's garage. Id. at *2. The garage where she was found was open-ended without doors, and her body was well-hidden. Id. An autopsy showed that the victim's cause of death was asphyxia caused by manual strangulation. Id. The forensic examiner who performed the autopsy opined that based upon decomposition, livor mortis, and the victim's stomach contents, she died at or near the time of her disappearance and was likely in the garage "'almost from the time of death.'" Id. at *4.

The medical examiner took vaginal swabs from the victim's vagina, and that evidence was preserved by rolling the swabs onto slides. Id. Subsequent analysis showed the presence of sperm, but DNA testing was not available in 1975. Id. The slides prepared were preserved by the medical examiner's office. Id. The Federal Bureau of Investigation ("FBI") conducted serology testing on the victim's underwear, pants, and blouse. Id. at *10. Those tests revealed no blood or semen on the underwear but did show the presence of semen on the pants and blood on the blouse. Id.

The case remained unsolved, but the Metro Nashville Police Department continued to investigate the murder, and in 1990 the victim's case file was reviewed in an attempt to locate evidence that could be submitted for DNA testing. Id. at *11. Between 1990 and 2004, the victim's pants, blouse, and the slides created from the vaginal swabs were tested multiple times by various laboratories. Id. at *11-12, *15-19. A DNA profile from this evidence was created in March 1992. Id. at *11. That DNA was compared to samples from over one hundred individuals, including samples from "almost everyone in the victim's neighborhood," but there were no matches. Id.

The Petitioner was eventually developed as a suspect, and police obtained a search warrant for his DNA in 2007. Id. at *15. The Petitioner's DNA matched a profile developed from the victim's blouse. Id. at *21. A DNA expert opined that the probability of a "random match" was one in six trillion. Id. The Petitioner was subsequently arrested and indicted. Id. at *15. In 2008, two jailhouse informants informed authorities that while he was in jail, the Petitioner made statements admitting that he had killed the victim but denying that he had raped her. Id. at *14.

-2-

After the jury's return of a guilty verdict, the Petitioner was sentenced to forty-four years to be served consecutively to a life sentence for a previous conviction. Id. at *25.

Following his unsuccessful direct appeal, the Petitioner filed a timely pro se petition for post-conviction relief. Counsel was appointed, and an amended pro se petition was filed.[1] The original petition and amended petition contained numerous grounds for post-conviction relief, only three of which have been maintained on appeal: (1) that trial counsel was ineffective for failing to call an alibi witness; (2) that counsel was ineffective for failing to call a DNA expert to testify for the defense; and (3) that counsel was ineffective for failing to timely request independent DNA testing.

At the evidentiary hearing, the Petitioner testified and described his relationship with his attorneys[2] as "pretty good," saying he "thought they were doing . . . a pretty good job at the time." He further agreed that he was satisfied with the "level of communication" he maintained with his attorneys.

The Petitioner testified that he discussed alibi witnesses with trial counsel "in the prep stage" fairly early in the course of his representation. The Petitioner claimed that he was in Chicago on the day of the murder at an Islamic Festival. The Petitioner was a member of the Nation of Islam, and he claimed that he remembered that particular day because it was "Saviours' Day," an important holiday in his faith. The Petitioner provided counsel with the names of several individuals who accompanied him on the trip to Chicago. The Petitioner said that trial counsel and the defense investigator tried to contact everyone on the list, but one person "couldn't remember" and several others had "moved out of town, died, or they weren't able to locate them." However, one individual, "Cicero,"[3] was able to confirm the Petitioner's presence in Chicago. Nevertheless, Cicero suffered from serious medical issues and was an ex-convict. According to the Petitioner, counsel did not want to call Cicero because he did not believe Cicero would be an effective witness, which counsel discussed with the Petitioner. Ultimately, Cicero was not called as an abili witness, a decision that the

---

[1] Although counsel had been appointed at the time the amended petition was filed, it was not filed by counsel and was submitted by the Petitioner.

[2] The Petitioner was represented by two attorneys from the Public Defender's Office; however, only one attorney testified at the post-conviction hearing, and the petitioner's appellate brief refers only to that individual in the context of his claim of ineffective assistance of counsel.

[3] From the record, it is unclear whether Cicero is the individual's given name or surname; also, the name is spelled differently throughout the record. We have adopted the spelling utilized by the Petitioner in his petition.

Petitioner admitted he agreed with at the time, noting that he "trusted [counsel's] judgment." In retrospect, however, the Petitioner said that "even a little bit might have been better than none" because Cicero was the only person who remembered his being in Chicago on the day the victim went missing.

The Petitioner agreed that the State's case was largely based on DNA evidence as well as inculpatory statements the Petitioner made. The Petitioner did not recall discussing an independent DNA expert with counsel, but he did remember that counsel filed a motion to continue so that an independent expert could be hired. He testified that the motion to continue was denied because it was filed too close to trial. The Petitioner said it was "probably his idea" to file the motion, but he could not recall when that request was made. According to the Petitioner, he "was impressed with the way [his attorneys] were handling the case and [his] confidence in them sort of caused [him] to relax a little bit on being fully engaged."

The Petitioner said that he and trial counsel did discuss the DNA evidence itself and how to best challenge it. The Petitioner said that there were multiple DNA analyses performed with varying results; thus, he thought it was important to obtain an independent analysis. According to the Petitioner, the State's expert testified inconsistently about the DNA evidence and "misused a lot of words related to DNA that prejudiced [the] jury." The Petitioner said that he was not aware that trial counsel retained and consulted with a DNA expert.

On cross-examination, the Petitioner said that he discussed his alibi with counsel soon after his first meeting with his attorneys. He also said that his request to counsel for independent DNA testing occurred early in the case. The Petitioner explained that while he did not believe counsel "intentionally" waited to file a motion for independent testing, he was not sure why it was filed so close to trial.

Trial counsel testified and agreed that he and the Petitioner discussed an alibi defense early in the case. Counsel said that he worked with a defense investigator, Amber Cassitt, and that he gave her the list of potential alibi witnesses and asked her to meet with the Petitioner to discuss details of the alibi and then to meet with as many people on the list as possible. According to trial counsel, Ms. Cassitt spent a "substantial amount of time" attempting to locate these potential witnesses. Trial counsel said that Ms. Cassitt was able to locate about half of the individuals named by the Petitioner, but some of them did not remember the Petitioner. Two people remembered the Petitioner and "thought that it was likely that he would have gone [to Chicago] because he was active in [the] [Nation of Islam] community at that time." However, Cicero was the only person who "specifically" told Ms. Cassitt that he recalled the Petitioner's being in Chicago on the relevant date.

-4-

According to trial counsel, Cicero was not actually located until closer to the trial date. Counsel decided to file a notice of alibi and then he and the Petitioner "had further discussion about whether . . . [Cicero] would be a good witness in terms of credibility issues." Trial counsel said that he stood by his decision not to call Cicero as a witness, saying that if there had been "stronger means to prove that [the Petitioner] was in Chicago," trial counsel would have presented that evidence. However, trial counsel opined that the alibi evidence they had was not strong, and he ultimately concluded that "putting out a weak alibi was worse than putting on no proof at all."

Trial counsel agreed that the State's case was primarily based on the DNA evidence and the testimony of jailhouse informants. Counsel said that the trial strategy was to undermine the credibility of the informants and, more generally, "to present a circumstantial case that it was unlikely that [the Petitioner] could have been in [the victim's] neighborhood in 1975 and gone unnoticed." Trial counsel said that, with respect to the DNA evidence, a profile other than the Petitioner's had been developed from the victim's clothing but was never matched to an individual, and the defense argued that profile belonged to the real offender.

Trial counsel said that he consulted with a DNA expert, Dr. Ronald Acklen. Dr. Acklen reviewed all the laboratory reports and materials related to the DNA testing. Counsel and Dr. Acklen discussed the "methodology and procedure" utilized by the various laboratories involved in the DNA analyses and "consulted about some potential cross[-]examination strateg[ies] for the various experts that [trial counsel] expected to testify at the trial." However, trial counsel decided not to call Dr. Acklen as a witness because "he would have just basically affirmed what the experts for the State were saying about the various technolog[ies] . . . used over the years to test [the] . . . evidence." Trial counsel opined that live testimony from Dr. Acklen would not have been beneficial to the defense.

Trial counsel recalled discussing the DNA evidence with the Petitioner and remembered that the Petitioner requested independent testing. Co-counsel located a laboratory that could test the DNA, and trial counsel filed a motion for funds to have the DNA evidence retested. When asked why he did not make this request earlier, trial counsel said that "[i]n retrospect" he wished he had made the request earlier, but from the discussions he had with Dr. Acklen, he did not think independent testing was necessary. He said that he regretted the decision because it was something the Petitioner wanted done.

Following the evidentiary hearing, the post-conviction court entered a detailed order denying the petition. As pertinent to our review, the court accredited trial counsel's testimony that he investigated Cicero as a potential alibi witness. The post-conviction court found that Cicero was suffering from health issues and had a criminal record. The

court noted that trial counsel and the Petitioner discussed whether to call Cicero as a witness and that the Petitioner was aware of the decision not to call him. Therefore, the court found that counsel did not render deficient performance in this respect and that the Petitioner had failed to show that he was prejudiced by this decision.

With respect to the issues related to calling a DNA expert and requesting independent DNA testing, the post-conviction court again accredited trial counsel's testimony that he consulted with a DNA expert but decided not to call him because Dr. Acklen's conclusion was the same as the State's experts. Also, Dr. Acklen was utilized as a resource for cross-examination strategies. The court noted that trial counsel "adequately investigated the DNA evidence" and that there was no evidence presented at the evidentiary hearing that the outcome would have been different had Dr. Acklen been called as a witness. Likewise, the court stated that it "heard no evidence that an independent DNA test would have produced favorable evidence to the [P]etitioner [or] would have affected the outcome of trial." The post-conviction court concluded that the Petitioner did not prove that counsel's decisions not to call Dr. Acklen or to request independent DNA analysis earlier in the case were deficient or that the Petitioner had been prejudiced in any way.

## ANALYSIS

On appeal, the Petitioner contends that trial counsel was ineffective in three ways: (1) for failing to call Cicero as an alibi witness; (2) for failing to call Dr. Acklen as an expert in DNA for the defense; and (3) for failing to timely request independent DNA analysis. The State responds that the Petitioner failed to show that trial counsel was deficient in any respect or that the Petitioner was prejudiced by counsel's performance.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires

-6-

proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

The Petitioner first contends that trial counsel was ineffective for failing to call Cicero as an alibi witness. According to the Petitioner, Cicero would have testified that he was in Chicago on the day that the victim disappeared. In order to satisfy the prejudice prong of Strickland when alleging that trial counsel was ineffective for failing to investigate or call witnesses, a petitioner must "show that through reasonable investigation, trial counsel could have located the witness . . . and . . . elicit[ed] both favorable and material testimony from the witness." State v. Denton, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). When a petitioner claims that trial counsel was ineffective for failing to call witnesses, the only way he can prove prejudice is by producing the testimony of those witnesses at the evidentiary hearing. See Black, 794 S.W.2d at 757.

Although the Petitioner and trial counsel testified that Cicero recalled the Petitioner's being in Chicago on the day of the victim's disappearance, Cicero was not called as a witness at the evidentiary hearing. Consequently, it is unclear what Cicero would have actually testified to and what impact, if any, that testimony would have had on the outcome of trial. Accordingly, the Petitioner has not shown prejudice, and he is not entitled to relief.

Next, the Petitioner contends that trial counsel was ineffective for not calling a DNA expert to testify for the defense. Again, the Petitioner failed to produce the testimony of a DNA expert at the hearing, and we therefore cannot assess what impact

-7-

such testimony would have had at trial. See Black, 794 S.W.2d at 757. The Petitioner has failed to prove that he was prejudiced by counsel's decision in this respect, and he is not entitled to relief.

Finally, the Petitioner contends that trial counsel was deficient for failing to make a timely request for independent DNA analysis. The Petitioner asserts that if "independent testing [had] been requested at an earlier and more reasonable time the request might have been granted." However, the Petitioner failed to introduce any results of independent testing at the hearing in support of his claim and offered no explanation as to how he was prejudiced by the absence of independent DNA testing.

At the evidentiary hearing, trial counsel testified that after consulting with Dr. Acklen, he determined that independent testing was not necessary. Dr. Acklen opined to counsel that he agreed with the conclusions reached by the State's experts. Additionally, Dr. Acklen advised trial counsel about particular areas of cross-examination. Counsel admitted at the hearing that "[i]n retrospect" he wished that he had requested independent testing earlier, mostly because it was something that the Petitioner wanted. However, when reviewing an attorney's conduct in the post-conviction context, "a fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Likewise, deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Trial counsel made a decision not to request independent testing based on his consultation with an expert and subsequent conclusion that additional testing would not be helpful. Although he expressed regret in hindsight that he did not request independent testing, we conclude that at the time, he made a reasonable strategic decision not to request independent testing earlier in the case. Accordingly, the Petitioner has not proven that counsel rendered deficient performance, and he is not entitled to relief.

CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE